UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| CYNTHIA NEMETH, | ) | |
| | ) | JURY TRIAL DEMAND |
| Plaintiff, | ) | |
| *vs.* | ) | Case No. 1:18-cv-1955 |
| | ) | |
| CARMEL CLAY SCHOOLS, | ) | |
| | ) | |
| Defendant. | ) | |

**COMPLAINT**

Plaintiff Cynthia Nemeth ("Nemeth"), for her Complaint against Carmel Clay Schools ("CCS") states as follows:

Introduction

1. This is an action to redress violations by CCS of the Family and Medical Leave Act, 29 U.S.C. § 2601, *et seq.* ("FMLA"), and Indiana state law. CCS interfered with Nemeth's entitlement to the benefits afforded her under the FMLA. CCS also terminated Nemeth in retaliation for requesting and taking medical leave for FMLA-qualifying conditions, and for reporting abuses of students and student-athletes by a CCS employees as she was required to do by Ind. Code § 31-33-5 *et seq*. As a result, Nemeth suffered damages as set forth herein.

Jurisdiction and Venue

2. This Court has subject matter jurisdiction under 28 U.S.C. § 1332 because Nemeth has raised federal claims herein under the FMLA. This Court has supplemental jurisdiction over Nemeth's causes of action arising under Indiana state law pursuant to 28 U.S.C. § 1367.

3. Venue lies in the United States District Court for the Southern District of Indiana because a substantial part of the events or omissions giving rise to Nemeth's claims occurred in Carmel, Indiana. 28 U.S.C. § 1391(b)(2).

4. Divisional venue is in the Indianapolis Division because the event leading to the claims for relief arose in Hamilton County.

Parties

5. Nemeth is an adult citizen and resident of Carmel, Indiana. At all relevant times, Nemeth was a special education resource professional and coach employed by CCS located at 5201 East Main Street, Carmel, Indiana 46033.

6. CCS is a public school located in Carmel, Indiana, serving Carmel and Clay Township.

7. At all times relevant herein, CCS acted by and through its agents, servants and employees, each of whom acted at all time relevant herein in the course and scope of their employment with and for CCS.

Background

8. In August, 2013, Nemeth commenced her employment relationship with CCS as a Life Skills Individual Aid, responsible for delivering support to students as they strive to overcome challenges arising from developmental disabilities, intellectual disabilities and behavioral health disorders related to all aspect of daily living.

9. Upon information and belief, Nemeth performed her Life Skills Individual Aid duties and responsibilities with an exemplary and unblemished employment record.

10. During the 2013-2014 academic year, CCS employed Nemeth as the Seventh Grade Girls Head Basketball Coach, and Girls Assistant Softball Coach.

11. Upon information and belief, Nemeth was an effective head coach and an effective assistant coach.

12. In August, 2014, CCS reassigned Nemeth to the Special Education Resource position, responsible for teaching math, reading and social skills to students with autism spectrum disorders and other developmental disabilities.

13. Upon information and belief, Nemeth performed her Special Education Resource duties and responsibilities with an exemplary and unblemished employment record.

14. During June of 2015, Nemeth received information showing an adult male Girls Assistant Basketball Coach employed by CCS ("Assistant Coach") was making sexual overtures toward the female student-athletes he coached, and was in possession of pictures depicting females in various stages of undress.

15. Nemeth promptly reported the matters referenced in paragraph 14 above, in good faith, to CCS's Athletic Director.

16. During the 2015-2016 academic year, CCS investigated Nemeth's report concerning the Assistant Coach referenced in paragraph 14.

17. During the course of CCS' investigation, CCS disclosed to the Girls Head Basketball Coach ("Head Coach") that Nemeth was the source of the report against the Assistant Coach, and that Nemeth's report was the impetus of CCS' investigation concerning the Assistant Coach's interactions with the female student-athletes he coached.

18. Prior to the 2015-2016 girls basketball season, CCS unilaterally and without justification and reason demoted Nemeth from Seventh Grade Head Girls Basketball Coach to Seventh Grade Assistant Girls Basketball Coach.

19. In or about February of 2016, Nemeth received information showing that the Head Coach was being verbally and physically abusive toward the female student-athletes he coached.

20. In or about March of 2016, Nemeth promptly reported the matter referenced in paragraph 19, in good faith, to CCS's Athletic Director.

21. In or about April of 2016, the Head Coach confronted Nemeth in an openly hostile and physically threatening manner in a hallway of the school building while classes were in session.

22. The Head Coach expressed his displeasure toward Nemeth for making the report

concerning the Assistant Basketball Coach and against him, and explicitly threatened her continued employment relationship with CCS ("Confrontation").

23. Nemeth subsequently notified CCS's Principal of the report against the Assistant Coach referenced in paragraph 14, the report against the Head Coach referenced in paragraph 19, and the Confrontation.

24. During the fall of 2016, CCS terminated Nemeth from her basketball and softball coaching positions because of her purported inability to "get along with" the Head Coach.

25. On or about September 8, 2016, Nemeth sustained a significant head injury when one of her pupils suddenly jerked backward while she was standing over him, causing the back of his head to strike the frontal area of Nemeth's head ("Accident").

26. Nemeth went to CCS's nurse's office to report the Accident, and receive medical care.

27. The CCS nurse eventually instructed Nemeth to report to MedCheck for a more thorough evaluation and medical treatment.

28. Nemeth was subsequently diagnosed as having sustained a significant concussion as a result of the Accident.

29. Nemeth notified CCS of her medical diagnosis referenced in paragraph 28, and the need to take intermittent medical leave of absences because of debilitating symptoms of the concussion.

30. CCS failed to notify Nemeth of her FMLA rights in response to the notice referenced in paragraph 29.

31. CCS failed to notify Nemeth that her intermittent medical leave of absence for the matters referenced in paragraph 29 would count toward her FMLA-qualified leave entitlement.

32. As a result of the injuries she sustained due to the Accident, Nemeth was absent multiple days in September, October, November, and December of 2016.

33. Nemeth properly called in and notified CCS of each instance that she was suffering from

concussion symptoms the prevented her from reporting to work.

34. CCS utilizes a point-system to track absenteeism.

35. CCS assigned points to Nemeth for each absence she incurred in September, October, November, and December of 2016, including those absences incurred due to the the Accident and absences incurred as a result of Nemeth attending scheduled medical appointments and treatments, and recovering from the concussion symptoms.

36. CCS failed to grant Nemeth FMLA leave for the Accident because of its misunderstanding of what qualifies as a "serious health condition."

37. CCS failed to request medical certification in writing from Nemeth for the Accident.

38. CCS failed and refused to consider medical certification from Nemeth's primary medical healthcare provider and her emergency room neurologist concerning her concussion diagnosis, her concussion symptoms, and ability to perform her employment duties and responsibilities during her recovery.

39. CCS failed to handle questions about the validity of Nemeth's concussion and her primary medical healthcare provider's corresponding medical certification pursuant to the guidelines set forth in the FMLA regulations.

40. CCS docked Nemeth's wages for the hours missed from work in connection with the Accident.

41. During the fall of 2016, Nemeth was diagnosed with breast cancer, and was scheduled for surgery in or about December of 2016.

42. In or about October of 2016, Nemeth notified CCS of her diagnosis and the scheduled surgical procedure referenced in paragraph 41, and her need to take an extended medical leave of absence following the surgical procedure for follow-up treatment and recovery.

43. CCS failed to notify Nemeth of her FMLA rights in response to the notice referenced in

paragraph 41.

44. CCS failed to notify Nemeth that her medical leave of absence for the matters referenced in paragraph 41 would count toward her FMLA-qualified leave entitlement.

45. In or about October of 2016 and pursuant to the recommendation of her oncologist, Nemeth obtained a template FMLA form from the U.S. Department of Labor's webpage, and completed the document with her oncologist concerning the matters referenced in paragraph 42.

46. On October 18, 2016, Nemeth submitted the FMLA form referenced in paragraph 45 to CCS.

47. On or about October 24, 2016, Nemeth's oncologist discovered a new lump in her breast that was subsequently diagnosed as cancer, which required her to undergo more significant surgical procedures scheduled in December, 2016, and necessitated an extended leave of absence for follow-up treatment and recovery.

48. On or about October 25, 2016, Nemeth notified CCS of her second cancer diagnosis, her scheduled surgical procedures in December, 2016, and medically prescribed follow-up recovery regimen necessitating her absence until approximately February 6, 2017.

49. CCS failed to notify Nemeth of her FMLA rights in response to the notice referenced in paragraph 48.

50. CCS failed to notify Nemeth that her medical leave of absence for the matters referenced in paragraph 48 would count toward her FMLA-qualified leave entitlement.

51. On or about October 28, 2016, Nemeth inquired of her entitlements under the FMLA with CCS.

52. On or about October 31, 2016, CCS for the first time disclosed to Nemeth her eligibility and rights and responsibilities under the FMLA in response to Nemeth's query referenced in paragraph 51, and was provided for the first time a "Certification of Health Care Provider for Employee's Serious

Health Condition" for completion by Nemeth's oncologist.

53. Nemeth satisfied the terms and conditions of CCS' FMLA eligibility and rights and responsibility requirements, and timely submitted the completed "Certificate of health Care Provider for Employee's Serious Health Condition" completed by her oncologist to CCS.

54. On or about December 5, 2016, Nemeth underwent significant cancer surgical procedures following her second cancer diagnosis.

55. In early January of 2017 and while Nemeth was off on pre-approved FMLA leave, CCS contacted Nemeth and notified her of its intent to terminate Nemeth's healthcare coverage unless she paid her insurance premium by January 6, 2017.

56. Nemeth paid the insurance premium by the January 6, 2017 deadline.

57. In late January of 2017 and while Nemeth was off on pre-approved FMLA leave, CCS again contacted Nemeth and notified her of its intent to terminate Nemeth's healthcare coverage unless she paid her insurance premium by February 3, 2017.

58. Nemeth was forced to report to CCS and personally pay the insurance premium by the February 3, 2017 deadline while she was off on pre-approved FMLA leave.

59. Nemeth remained off work recovering from her second cancer surgical procedures until February 7, 2017 when she returned to CCS and resumed her employment duties.

60. Nemeth continued performing her employment duties for CCS until March 3, 2017, when she was scheduled for follow-up surgical procedures for the second cancer diagnosis referenced in paragraph 47.

61. Nemeth notified CCS of the scheduled March 3, 2017 follow-up medical procedure, and her need to be absent undergoing follow-up treatment and recovery until approximately March 23, 2017.

62. Nemeth resumed her teaching duties and responsibilities on or about March 23, 2017

and continued working through the end of the 2016-2017 academic year.

63. CCS terminated Nemeth when it elected not to renew Nemeth's teaching contract for the 2017-2018 academic year.

64. CCS counted Nemeth's FMLA leave against the school's absentee policy for disciplinary purposes.

65. CCS terminated its employment relationship with Nemeth for using FMLA.

66. CCS retaliated against Nemeth for reporting the Assistant Coach and Head Coach's suspected child abuses.

67. As a direct and proximate result of the foregoing conduct:

    (a) Nemeth incurred and continues to incur a substantial loss of present and future income;

    (b) Nemeth has lost the fringe benefits provided by CCS;

    (c) Nemeth has suffered damage to her career;

    (d) Nemeth has suffered mental and physical anguish; and

    (e) Nemeth has incurred additional financial losses, including the costs associated with invoking her rights and entitlements under the FMLA.

Statement of Claims

COUNT I
(*FMLA Interference*)

68. Nemeth re-alleges and incorporates by reference paragraphs 1 through 67.

69. Nemeth was an eligible employee under the definitional terms of the FMLA, 29 U.S.C. § 2611(2).

70. CCS qualifies as an "employer" as the term in defined in the FMLA, 29 U.S.C. § 2611(4).

71. There was an "entitlement to leave" as defined in the FMLA, 29 U.S.C. § 2612(1), and CCS denied Nemeth to her entitlements for leave as prescribed by the FMLA.

72. Nemeth requested leave for serious health conditions.

73. Nemeth was entitled to receive leave pursuant to the FMLA.

74. Nemeth provided notices to CCS that she suffered from various serious health conditions and that she needed to take time off to recover from the serious health conditions.

75. CCS failed to designate Nemeth's absences as FMLA-qualifying.

76. CCS terminated Nemeth as a result of her attendance record in violation of the FMLA.

77. Nemeth claims damages under the FMLA for the injuries set forth above against CCS for violations of her federally protected rights and entitlements.

COUNT II
(*FMLA Retaliation*)

78. Nemeth re-alleges and incorporates by reference paragraphs 1 through 67.

79. On various occasions, Nemeth provided notice to CCS that she was suffering from serious health conditions and needed to take time off for medical care, treatments and recovery.

80. CCS retaliated against Nemeth by disciplining and terminating Nemeth for taking FMLA-qualifying absences.

81. CCS's retaliatory actions and separate interference violations constitute unlawful acts under the FMLA.

82. Nemeth claims damages under the FMLA for the injuries set forth above against CCS for violations of her federally protected rights and entitlements.

## COUNT III
*(Wrongful Termination in Violation of Public Policy)*

83. Nemeth re-alleges and incorporates by reference paragraphs 1 through 67.

84. It is against the public policy of this state to terminate an employee for complying with state law mandating reporting suspected child abuse and exploitation.

85. CCS's conduct in terminating Nemeth for complying with Ind. Code § 31-33-5 *et seq.* and reporting, in good faith, suspected child abuse and exploitation violated the public policy of this state and caused Nemeth damages.

WHEREFORE, Plaintiff Cynthia Nemeth respectfully prays for judgment against Defendant Carmel Clay Schools as follows:

A. Statutory damages for lost wages, benefits, and other compensation, plus interest thereon at the statutory rate, pursuant to 29 U.S.C. § 2617(a)(1)(A)(i) and 29 U.S.C. § 2617(a)(1)(A)(ii);

B. Additional liquidated damages in the amount of the above-requested award, pursuant to 29 U.S.C. § 2617(a)(1)(A)(iii);

C. Equitable relief in the form of reinstatement or front pay, as the court deems appropriate, pursuant to 29 U.S.C. § 2617(a)(1)(B);

D. Attorney's fees, expert witness fees, and costs of this action, pursuant to 29 U.S.C. § 2617(a)(3); and

E. Such other and further relief as may be just and proper under the circumstances, including but not limited to appropriate injunctive relief.

<u>Jury Trial Demand</u>

Plaintiff demands a jury trial, pursuant to the Seventh Amendment to the Constitution of the United States, as to all claims for damages.

Respectfully submitted,

 */s/ Robert M. Oakley*
Daniel K. Dilley (22715-49)
Robert M. Oakley (26890-06)
DILLEY & OAKLEY, P.C.
933 Keystone Way
Carmel, Indiana 46032
O: (317) 564-4932
Email: firm@dilley-oakley.com